## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMPUTER SCIENCES CORPORATION, | |
| Plaintiff, | No. _____ Civ. _____ (_____) |
| v. | |
| ENDURANCE RISK SOLUTIONS ASSURANCE CO., HOMELAND INSURANCE COMPANY OF NEW YORK, ASPEN INSURANCE UK LIMITED, ASPEN INSURANCE LIMITED FOR AND ON BEHALF OF LLOYD'S UNDERWRITER SYNDICATE NO. 4711, ASPEN UNDERWRITING LIMITED FOR AND ON BEHALF OF LLOYD'S UNDERWRITER SYNDICATE, ASPEN MANAGING AGENCY LIMITED FOR AND ON BEHALF OF LLOYD'S UNDERWRITER SYNDICATION NO. 4711, LLOYD'S UNDERWRITER SYNDICATE NO. 4711, | **COMPLAINT** <br><br> **JURY DEMAND** |
| Defendants. | |

## INTRODUCTION

Plaintiff Computer Sciences Corporation ("CSC" or "Plaintiff"), by and through its counsel Barnes & Thornburg LLP, for its complaint against Defendants Endurance Risk Solutions Assurance Co. ("Endurance"), Homeland Insurance Company of New York ("Homeland"), Aspen Insurance UK Limited ("Aspen"), Aspen Insurance Limited for and on behalf of Lloyd's Underwriter Syndicate No. 4711 ("AIL"), Aspen Underwriting Limited for and on behalf of Lloyd's Syndicate No. 4711 ("AUL"), Aspen Managing Agency Limited for and on behalf of Lloyd's Underwriter Syndicate No. 4711 ("AMAL"), and Lloyd's Underwriter Syndicate No. 4711 (collectively the "Defendant Insurers"), alleges and states as follows:

1

## NATURE OF THE ACTION

1.      CSC is a technology and information services company that among its offerings develops enterprise software solutions for large corporate clients on a fee-for-service basis.[1] Like any service provider, CSC sometimes has disputes with its clients regarding its services. Each year, CSC purchased insurance to protect itself against liability claims asserted by such clients. As explained in more detail below, this case arises out of the bad faith attempt by certain of CSC's insurers to avoid their coverage obligations to CSC.

2.      In 2014, CSC purchased a tower of bespoke insurance policies, tailor-made to protect it against claims asserted by customers. CSC paid its insurers millions of dollars in premiums for these policies.

3.      When a claim arose under CSC's 2014-2015 policy tower and an arbitrator awarded $84 million to a CSC client, plus interest, fees and costs, the insurers that wrote the first $75 million of CSC's tower honored their commitments and paid their limits as agreed. But the Insurers named as Defendants here – which owe the next $25 million of this loss – refused to pay, forcing CSC to come out-of-pocket for the rest of the award against it. The Defendant Insurers' abandonment of CSC in its hour of need was more than just a breach of the coverage promise for which they had been richly paid. It was an egregious act of bad faith, rendering the Defendants liable for all the substantial damages CSC has suffered as a result. By this action, CSC seeks recovery of the $25 million the Defendant Insurers should have paid, and damages for their bad faith treatment of CSC.

4.      Like all technology companies, one of CSC's chief operational risks was liability to a client that had paid for, but been dissatisfied with, its services. Like virtually all such

---

[1] /  On April 1, 2017, CSC and the Enterprise Service division of Hewlett Packard Enterprise merged to form DXC Technology Company ("DXC"). CSC remains a wholly-owned subsidiary of DXC.

companies, CSC bought professional liability insurance coverage to provide protection against this kind of liability exposure, called technology errors and omissions ("Technology E&O") insurance. Underwriters of Technology E&O policies understand that their policyholders are often paid millions of dollars for their services by clients who are sometimes unhappy with the end result. In those situations, the client's primary (and often only) alleged loss, and the primary measure of damages for which clients seek recovery, is the compensation the client paid the service provider. Thus, the reason companies like CSC buy Technology E&O insurance is to protect them from professional liability to clients for compensatory damages equivalent to fees the customer paid them. Underwriters understand this, and they price their policies to cover liability for just this kind of claim for damages.

5. In 2014, CSC's Technology E&O insurance program consisted of a primary insurance policy and "follow form" excess insurance policies which adopted the essential terms and conditions of the primary policy. CSC constructed a tower of insurance policies based on a highly-customized primary policy, with each excess policy extending a different amount of coverage but subject to the same or similar terms and conditions as the followed form. By purchasing follow form excess insurance policies, CSC created a cohesive Technology E&O insurance program where one layer led smoothly into the next. This allowed CSC to negotiate with the primary insurer for "manuscript"[2] terms and conditions that would be incorporated into each of the excess policies in its Technology E&O program.

6. The primary policy in CSC's 2014-2015 Technology E&O program included bespoke terms and conditions designed to cover the types of liabilities that were likely to result

---

[2] /   A manuscripted insurance policy, or manuscripted language, is drafted specially for an insured's unique risk profile.

3

from a services-related dispute between CSC and one of its customers, where the client's primary loss would be the compensation it paid CSC for services rendered. These terms and conditions were adopted by each of the excess insurers in the 2014-2015 program and incorporated into their respective follow form excess policies.

7.      When a dispute arose between CSC and its customer, Kemper Corporate Services, Inc. ("Kemper") regarding CSC's development of an enterprise software solution (the "Claim"), CSC turned to its 2014-2015 Technology E&O insurance carriers for coverage. The first four layers of CSC's 2014-2015 Technology E&O insurance program – which consisted of policies issued by some of the largest and most sophisticated insurance companies in the world – recognized that the Kemper Claim was covered and paid a total of $75 million for CSC's liabilities and defense expenses arising from the Claim. The Defendant Insurers, whose policies sit in the fifth layer of CSC's 2014-2015 Technology E&O program, denied coverage for the same Claim. The Defendant Insurers' denial of coverage is wrongful and unjustified. Their respective follow form excess policies incorporate the exact same manuscript terms and conditions that prompted the lower layer insurers to pay this Claim. The Defendant Insurers specifically market their ability to provide insureds with customized Technology E&O insurance policies like the policies at issue, yet they have brazenly refused to honor the specifically-negotiated and manuscripted terms and conditions in CSC's primary policy, under which the Kemper Claim is clearly covered.

## THE PARTIES

8.      Plaintiff CSC is a corporation organized and existing under the laws of the state of Nevada with its principal place of business in Virginia.

9.      Defendant Endurance is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in New York. Endurance is licensed by the

4

New York State Department of Financial Services to transact business in New York and is engaged in the business of selling insurance policies.

10.     Defendant Homeland is a corporation organized and existing under the laws of the state of New York with its principal place of business in Minnesota.  Homeland is licensed by the New York State Department of Financial Services to transact business in New York and is engaged in the business of selling insurance policies.

11.     Defendant Aspen is a business entity organized and existing under the laws of the United Kingdom with its principal place of business in London, England.  Aspen is licensed by the New York State Department of Financial Services to transact business in New York and is engaged in the business of selling insurance policies.

12.     Defendant AIL is a business entity organized and existing under the laws of the United Kingdom with its principal place of business in London, England.  Upon information and belief, AIL is authorized to conduct business in New York either directly or by and through its agreements with affiliates or agents.

13.     Defendant AUL is a business entity organized and existing under the laws of the United Kingdom with its principal place of business in London, England.  AUL is the sole corporate member of Syndicate No. 4711 and provides its underwriting capacity.  Upon information and belief, AUL is authorized to conduct business in New York either directly or by and through its agreements with affiliates or agents.

14.     Defendant AMAL is a business entity organized and existing under the laws of the United Kingdom with its principal place of business in London, England.  AMAL is the sole managing agent of Syndicate No. 4711.  Upon information and belief, AMAL is authorized to conduct business in New York either directly or by and through its agreements with its affiliates

or agents.

15.     Defendant Syndicate No. 4711 is an unincorporated association organized and existing under the laws of the United Kingdom with its principal place of business in London, England. Upon information and belief, Syndicate 4711 is authorized to conduct business in New York either directly or by and through AIL, AUL, AMAL or agreements with its affiliates or agents.[3]

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over each of the Defendant Insurers because they are qualified to do business in New York, and have transacted and are transacting business in New York with respect to the transactions alleged in this Complaint by selling insurance and adjusting insurance claims in this state. Additionally, (a) Endurance's principal place of business is New York, and it issued the excess policy that it sold to CSC out of Endurance's "New York, NY" office; (b) Homeland is organized under the laws of New York; and (c) Aspen UK consented to personal jurisdiction in New York by virtue of the "Choice of Law and Jurisdiction" and "Service of Suit (USA)" clauses in the excess insurance policy it sold to CSC, under which service is complete when made upon a New York law firm.

18.     Venue is proper in this District under 28 U.S.C. §1391 because each of the Defendant Insurers is subject to the Court's personal jurisdiction, and resides and/or is transacting

---

[3] / Aspen, AIL, AUL, AMAL and Syndicate No. 4711 are referred to herein collectively as Aspen UK.

insurance business in this judicial District.

<strong><u>FACTS</u></strong>

**A.      <u>The 2014-2015 Technology E&O Program.</u>**

19.      CSC purchased ACE DigiTech® Digital Technology & Professional Liability Policy No. EON G23658586 007 from Illinois Union Insurance Company for the policy period of November 1, 2014 to November 1, 2015, which provided for $10 million of coverage, excess of a $20 million retention (the "Ace Policy" or "Followed Policy").  (A true and correct copy of the Ace Policy is attached hereto as Exhibit A.)

20.      The Ace Policy was the primary policy in CSC's Technology E&O insurance program for the policy period November 1, 2014 to November 1, 2015.  Above the primary policy, the tower was made up of several excess liability policies that "follow form" to the Ace Policy, meaning that, aside from the attachment points and limits of liability, and unless otherwise specified, they incorporated and adopted the terms, conditions, definitions, and exclusions in the Ace Policy.

21.      CSC purchased Excess Liability Policy No. QK1403388 from Beazley acting for and on behalf of Lloyd's Underwriting Syndicate Nos. 2623 and 0623 ("Beazley") for the 2014-2015 Technology E&O program (the "Beazley Excess Policy").  The Beazley Excess Policy follows form to the Ace Policy and provides a limit of liability of $15 million excess of $10 million. The Beazley Excess policy is the only policy in the first layer of CSC's 2014-2015 Technology E&O program.

22.      CSC purchased Excess Liability Policy No. 01-803-26-73 from AIG Specialty Insurance Company ("AIG") for the 2014-2015 Technology E&O program (the "AIG Excess Policy").  The AIG Excess Policy follows form to the Ace Policy and provides a limit of liability

7

of $20 million excess of $25 million. The AIG Excess policy is the only policy in the second layer of CSC's 2014-2015 Technology E&O program.

23.     CSC purchased Excess Liability Policy No. QPL-0006012 from QBE Specialty Insurance Company ("QBE") for the 2014-2015 Technology E&O program (the "QBE Excess Policy"). The QBE Excess Policy, which was in the form of a memorandum of insurance, follows form to the Ace Policy and provides a limit of liability of $10 million excess of $45 million. The QBE Excess policy is the only policy in the third layer of CSC's 2014-2015 Technology E&O program.

24.     The fourth layer of CSC's 2014-2015 Technology E&O program is a "quota-share"[4] layer extending a collective limit of liability of $20 million.

25.     CSC purchased Excess Liability Policy No. 2014 10F149807-1 from General Security Indemnity Company of Arizona ("Scor") for the 2014-2015 Technology E&O program (the "Scor Excess Policy"). The Scor Excess Policy, which was in the form of a memorandum of insurance, follows form to the Ace Policy and provides a limit of liability of $10 million excess of $55 million. The Scor Excess Policy's $10 million limit of liability is part of the fourth layer's $20 million quota-share.

26.     CSC purchased Excess Liability Policy No. 000797505 from Ironshore Specialty Insurance Company ("Ironshore") for the 2014-2015 Technology E&O program (the "Ironshore Excess Policy"). The Ironshore Excess Policy, which was in the form of a memorandum of insurance, follows form to the Ace Policy and provides a limit of liability of $10 million excess of $55 million. The Ironshore Excess Policy's $10 million limit of liability is part of the fourth layer's

---

[4] /   In a quota-share layer of an insurance tower, multiple insurers agree to provide a collective, shared limit of liability of which each insurer agrees to insure a specific percentage or dollar amount.

$20 million quota-share.

27.     The fifth layer of CSC's 2014-2015 Technology E&O program is a quota-share layer extending a collective limit of liability of $25 million.

28.     CSC purchased Excess Liability Policy No. PRX10004334301 from Endurance for the 2014-2015 Technology E&O program (the "Endurance Excess Policy").   The Endurance Excess Policy follows form to the Ace Policy and provides a limit of liability of $5 million excess of $75 million.   The Endurance Excess Policy's $5 million limit of liability is part of the fifth layer's $25 million quota-share.   (A true and correct copy of the Endurance Excess Policy is attached hereto as Exhibit B.)

29.     CSC purchased Excess Liability Policy No. TPX-0160-14 from Homeland for the 2014-2015 Technology E&O program (the "Homeland Excess Policy").   The Homeland Excess Policy follows form to the Ace Policy and provides a limit of liability of $10 million excess of $75 million.   The Homeland Excess Policy's $10 million limit of liability is part of the fifth layer's $25 million quota-share.   (A true and correct copy of the Homeland Excess Policy is attached hereto as Exhibit C.)

30.     CSC purchased Excess Liability Policy No. QK1403608 from Aspen UK for the 2014-2015 Technology E&O program (the "Aspen UK Excess Policy").   The Aspen UK Policy follows form to the Ace Policy and provides a limit of liability of $10 million excess of $75 million. The Aspen UK Excess Policy's $10 million limit of liability is part of the fifth layer's $25 million quota-share.   (A true and correct copy of the Aspen UK Excess Policy is attached hereto as Exhibit D.)

31.     The Endurance, Homeland and Aspen UK Excess Policies are collectively referred to herein as the "Fifth Layer Excess Policies."

9

32.     Consistent with the above allegations, the following table identifies each of the insurance companies, including the Defendant Insurers, making up each layer of coverage in CSC's 2014-2015 E&O Program and their respective limits of liability:

| Ins. Co. Name | Layer | Limit of Liability (by Ins. Co.) x = "in excess of" | Limit of Liability (by Layer) |
|---|---|---|---|
| Ace | P | $10 million | $10 million |
| Beazley | 1st | $15 million x $10 million | $15 million |
| AIG | 2nd | $20 million x $25 million | $20 million |
| QBE | 3rd | $10 million x $45 million | $10 million |
| Scor | 4th | $10 million x $55 million | $20 million |
| Ironshore | 4th | $10 million x $55 million | |
| OneBeacon | 5th | $10 million x $75 million | $25 million |
| Aspen UK | 5th | $10 million x $75 million | |
| Endurance | 5th | $5 million x $75 million | |

33.     CSC has paid, in full, the premiums for all policies in the 2014-2015 Technology E&O program, including the premiums charged by the Defendant Insurers for the Fifth Layer Excess Policies.

**B.      The Ace Policy – Key Defined Terms**

34.     The Ace Policy includes several insuring agreements, including the "Technology and **Internet** Errors and Omissions Liability"[5] insuring agreement, which provides, in relevant part, as follows:

---

[5] /   Emphasized terms in the Ace Policy are defined therein.

10

> In consideration of the payment of the premium, in reliance on the **Application,** and subject to the Declarations and the terms and conditions of this **Policy,** the **Insureds** and the **Insurer** agrees as follows: ...
>
> If Insuring Agreement A, Technology and **Internet** Errors and Omissions Liability coverage, is purchased ... the **Insurer** will pay **Damages** and **Claims Expenses** of the **Insured** which the **Insured** becomes legally obligated to pay by reason of a **Claim.**...

Ace Policy, § I.A. CSC purchased Technology and Internet Errors and Omissions Liability coverage from Ace.

35.     The Ace Policy defines "Wrongful Act," with respect to the Technology and Internet Errors and Omissions Liability insuring agreement, to mean "any error, misstatement, misleading statement, act, omission, neglect, breach of duty...actually or allegedly committed or attempted by any **Insured** in their capacity as such" in "the **Insured's**...rendering or failure to render **Technology Services** to others for a fee, or ... the failure of the **Insured's Technology Products** to perform the function or serve the purpose intended." *Id.,* § II.QQ.1.a.-b. On information and belief, this language was not drafted specifically for CSC. On information and belief, the same or similar language is found in insurance policies that the Defendant Insurers have followed and/or sold to other insureds.

36.     The Ace Policy defines "Technology Services" to mean:

> 1. Information technology consulting and information systems or network analysis, design, programming or integration;
>
> 2. Database designed and the caching, collecting, compiling, processing, mining, or recording or analysis of data;
>
> 3. Other related services, including:
>
>     a. Information system outsourcing;
>     b. **Website** design, programming or maintenance;

11

    c.  Information system or **Website** hosting;
    d.  **Internet** access services;
    e.  **Internet** search or navigational tool provision;
    f.  Electronic mail services;
    g.  Application software delivery; and

4.  those professional services provided or contracted to be provided by the **Insured** to others for a fee or other consideration in the ordinary course of the **Insured's** business;

*Id.*, § II.LL.1.-4. On information and belief, part of the language in § II.LL.4. of the definition of Technology Services was drafted specifically for CSC. On information and belief, the rest of the language of the definition of Technology Services was not drafted specifically for CSC and is the same as, or similar to, language that is found in insurance policies that the Defendant Insurers have followed and/or sold to other insureds.

37.    The Ace Policy defines "Technology Products" to mean "computer or telecommunications hardware, software, or related electronic equipment, including the design, development, manufacturing, assembly, distribution, licensing, leadings, sale, installation, repair or maintenance thereof." *Id.*, § II.KK. On information and belief, this language was not drafted specifically for CSC. On information and belief, the same or similar language is found in insurance policies that the Defendant Insurers have followed and/or sold to other insureds.

38.    The Ace Policy defines "Claims Expenses" to mean:

1.  reasonable and necessary attorneys' fees, expert witness fees and other fees and costs incurred by the **Insurer**, or by the **Insured** with the **Insurer's** prior written consent, in the investigation and defense of a covered **Claim** (except that such consent is not required for **Claims** that have not triggered the reporting threshold in section VIII, Notice);

2.  reasonable and necessary premiums for any appeal bond, attachment bond or similar bond, provided the **Insurer** shall have no obligation to apply for or furnish such bond; and

12

3.   prejudgment and post judgment interest awarded in any **Claim**.

*Id.*, § II.F.1.-3.  On information and belief, this language was not drafted specifically for CSC.  On information and belief, the same or similar language is found in insurance policies that the Defendant Insurers have followed and/or sold to other insureds.

39.   The Ace Policy defines "Damages" to mean:

> **Damages** means all forms of monetary damages, including actual damages, statutory damages, punitive, exemplary, and multiple damages (where insurable), compensatory damages, funds paid into a Consumer Redress Fund, any award of prejudgment or post-judgement interest, and settlements which the **Insured** becomes legally obligated to pay on account of any **Claim** first made against any **Insured** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for **Wrongful Acts** to which this policy applies.

*Id.*, § II.K.  On information and belief, part of the language in the definition of Damages was drafted specifically for CSC.  On information and belief, the rest of the language of the definition of Damages is the same as or similar to language found in insurance policies that the Defendant Insurers have followed and/or sold to other insureds.

## C.   <u>The Ace Policy – Exclusions</u>

40.   The Ace Policy excludes, among others, the following types of Damages:

1.   any amount for which the **Insured** is not financially liable or legally obligated to pay;
2.   taxes, fines, penalties, or sanctions imposed against an **Insured**;
3.   matters uninsurable under the laws pursuant to which this **Policy** is construed;
4.   the cost to comply with an injunctive or other non-monetary or declaratory relief, including specific performance, or any agreement to provide such relief;
5.   loss of fees or profits by the **Insured**, return of fees, commissions or royalties by the **Insured**, or re-performance of services by the **Insured** or under the **Insured's** supervision; however, compensatory amounts

> equivalent to fees which are used as a measure of
> otherwise covered **Damages** shall not trigger this
> exclusion.
>
> 6. disgorgement of any profit, remuneration or financial
>    advantage to which any **Insured** was not legally entitled;
> 7. penalties of any nature, however denominated, arising by
>    contract;
> 8. liquidated damages; and
> 9. any amounts other than those intended solely to
>    compensate for a loss caused by a **Wrongful Act**.

*Id.*, § II.K.1.-9. On information and belief, part of the language in Exclusion II.K.5 (the "Return

of Fees" Exclusion) was drafted specifically for CSC. On information and belief, the same or

similar language in Exclusions II.K.1.-4. and 6.-9. is found in insurance policies that the Defendant

Insurers have followed and/or sold to other insureds.

      41.    The Ace Policy provides that "the **Insurer** shall not be liable for **Damages** or

**Claims Expenses** on account of any **Claim**: ...

> for breach of any express, implied, actual or constructive
> contract, warranty, guarantee, or promise, including any
> actual or alleged liability assume by the **Insured**, unless such
> liability would have attached to the **Insured** even in the
> absence of such contract, warranty, guarantee, or promise.
> This exclusion will not apply to that part of a **Claim** factually
> underlying which is, or which factually arises out of, an
> actual or perceived failure to perform **Media Activities** or
> **Technology Services** with a reasonable or professional
> standard of care or consistent with industry standards or
> practices, without regard to whether any such failure is
> alleged or would itself be legally actionable. Further, this
> exclusion will not apply to...the failure of the **Insured's**
> **Technology Products** otherwise covered by section 1.b. of
> the definition of **Wrongful Act**...."

*Id.*, at § III.C. On information and belief, part of the language in Exclusion III.C. (the "Contractual

Liability Exclusion") was drafted specifically for CSC. On information and belief, the rest of the

language of the Contractual Liability Exclusion was not drafted specifically for CSC and is the

same as, or similar to, language found in insurance policies that the Defendant Insurers have

followed and/or sold to other insureds.

42.     The Ace Policy provides that "the **Insurer** shall not be liable for **Damages** or

**Claims Expenses** on account of any **Claim**: ...

> alleging, based upon, arising out of or attributable to the
> gaining in fact of any profit, remuneration or financial
> advantage to which any **Insured** was not legally entitled.
> However, this exclusion shall not apply to **Claims Expenses**
> or the **Insurer's** duty to defend any such **Claim** until there
> is a judgment against, binding arbitration against, adverse
> admission by, finding of fact against, or plea of *nolo*
> *contendere* or no contest by the **Insured**, at which time the
> **Insured** shall reimburse the **Insurer** for any **Claims**
> **Expenses** paid by the **Insurer**."

*Id.*, at § III.I.  On information and belief, the language in Exclusion III.I. (the "Disgorgement

Exclusion") was not drafted specifically for CSC.  On information and belief, this language is

found in insurance policies that the Defendant Insurers have followed and/or sold to other insureds.

**D.      The Ace Policy – ADR Provision**

43.     The Ace Policy includes an "Alternative Dispute Resolution" provision ("ADR

Provision") that provides, in pertinent part, as follows:

> The **Insureds** and the **Insurers** shall submit any dispute or
> controversy arising out of or relating to this **Policy** or the
> breach, termination or invalidity thereof to the alternative
> dispute resolution ("ADR") process set forth in this Section.
>
> Either an **Insured** or the **Insurer** may elect the type of ADR
> process discussed below; provided, however, that the
> **Insured** shall have the right to reject the choice  by the
> **Insurer** of the type of ADR process at any time prior to its
> commencement, in which case the choice by the **Insured** of
> ADR process shall control.
>
> There shall bet two choices of ADR process; (1) non-binding
> **Mediation** administered by a **Mediation** facility to which
> the **Insurer** and the **Insured** mutually agree, in which the
> **Insured** and the **Insurer** shall try in good faith to settle the

> dispute by **Mediation** in accordance with the then-prevailing commercial **Mediation** rules of the **Mediation** facility; or (2) arbitration.... In the event of **Mediation**, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 60 days after the date the **Mediation** shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.
>
> Either ADR process may be commenced in New York, New York....

*Id.*, at § XIX. On information and belief, the language in the ADR Provision was not drafted specifically for CSC and is found in insurance policies that the Defendant Insurers have followed and/or sold to other insureds.

**E.     The Endurance Excess Policy**

44.     The Endurance Excess Policy's "Insuring Clause" provides, in pertinent part, as follows:

> This Policy shall provide to the **Insureds** insurance coverage for any covered Loss resulting from covered Claims, and shall attach to the Insurer only after (i) the insurers of the **Underlying Policy(ies)**, the **Insureds**, and/or any other party shall have paid in legal currency the full amount of the **Underlying Limit**, and (ii) the **Insureds** shall have paid any applicable retention or deducible under the **Primary Policy**.

Endurance Excess Policy, § I.[6] On information and belief, this language was not drafted specifically for CSC. On information and belief, this language is found in excess insurance policies that Endurance has sold to other insureds.

45.     The Endurance Excess Policy's "Terms and Conditions" provide, in pertinent part, as follows: "This Policy, except as stated herein, is subject to all terms, conditions and limitations

---

[6] /   Emphasized terms in the Endurance Excess Policy are defined therein.

as contained in the **Followed Form** as of the inception of this Policy...." *Id.*, at § II.A.  On information and belief, this language was not drafted specifically for CSC.  On information and belief, this language is found in excess insurance policies that Endurance has sold to other insureds.

46.     The Endurance Excess Policy defines "Followed Form" as the Ace Policy.  *Id.* at Declarations, Item 7.B.

47.     The Endurance Excess Policy's defines "Underlying Policy(ies)" as the Ace Policy, Beazley Excess Policy, AIG Excess Policy, QBE Excess Policy, Scor Excess Policy and Ironshore Excess Policy.  *Id.* at Declarations, Item 7.A.

48.     The Endurance Excess Policy's defines "Primary Policy" as the Ace Policy.  *Id.* at Declarations, Item 7.A.

49.     The Endurance Excess Policy also provides that: "Notwithstanding anything in this Policy to the contrary, the insurance coverage as afforded by this Policy, as respects coverage for operations in Virginia, shall conform to the coverage requirements of the applicable insurance laws and regulations of Virginia." *Id.* at End. No. 1, Virginia Changes, § 1.

F.      <u>The Homeland Excess Policy</u>

50.     The Homeland Excess Policy or "Memorandum of Insurance" defines the "Company" to mean Homeland.  Homeland Excess Policy, Insured With, p. 1.

51.     Under the Homeland Excess Policy, "[t]he Company warrants that:

> This Memorandum of Insurance incorporates all terms (except as regards the Premium and Limit of Liability) set forth in the Illinois Union Insurance Company policy number EON G23658586 007 (the "Primary Policy") on the identical subject matter and risk, and is subordinate to the Primary Policy.  In matters regarding claims, the Company will act exclusively through the representative(s) designated by the insurer to the Primary Policy, but will act on their own behalf with respect to the settlement of claims."

17

*Id.*, § (a). The "Primary Policy" is the Ace Policy. Homeland Excess Policy, Primary Policy, p.

1. On information and belief, this language was not drafted specifically for CSC. On information

and belief, this language is found in excess insurance policies that Homeland has sold to other

insureds.

52.    Under the Homeland Excess Policy, "[t]he Company warrants that:

> Up to the application Limit of Liability set forth in this
> Memorandum of Insurance, liability shall attach to the
> Company only after the insurers of [sic] all of the underlying
> policies (including but not [limited to] the Primary Policy),
> the Insured, or others on behalf of the Insured shall have paid
> the total limits of liability for all of the underlying policies,
> and solely as a result of payments for claims or losses
> covered under the Primary Policy and this Memorandum of
> Insurance."

*Id.*, § (d). On information and belief, this language was not drafted specifically for CSC. On

information and belief, this language is found in excess insurance policies that Homeland has sold

to other insureds.

**G.    The Aspen UK Excess Policy**

53.    The Aspen UK Excess Policy provides that Aspen UK's "[l]iability to pay under

this Policy shall not attach unless and until the Underwriters of the Underlying Policy(ies) shall

have paid or have admitted liability or have been held liable to pay, the full amount of their liability

inclusive of costs and expenses." Aspen UK Excess Policy, Part II, cl. 1, p. 8.

54.    Additionally, the Aspen UK Excess Policy provides that:

> In consideration of the premium charged for the Policy, it is
> hereby understood and agreed that notwithstanding Clauses
> 1, 2 and 3 of this Policy, in the event that the **Insureds** and
> the insurer under any of the **Underlying Policies** reach an
> agreement whereby the insurers agrees to pay covered loss
> in an amount less than the applicable **Underlying Policy
> Limit** and the **Insureds** pay the remainder of the applicable
> **Underlying Policy Limit,** such payment by the **Insureds**
> will be deemed to apply toward exhaustion of the

**Underlying Policy Limit**.

*Id.*, at Part II, supp. cl. Exhaustion of Underlying Policy Limit Due to Insured Payment, p. 16.[7]

55.     The Schedule for the Aspen UK Excess Policy provides a "Choice of Law and Jurisdiction" clause, which provides as follows:

> Any dispute concerning the interpretation of the terms, conditions, limitations and/or exclusions contained in this policy is understood and agreed by both the (re)insured and the (re)insurers to be subject to the law of New York.
>
> Each party agrees to submit to the jurisdiction as per the Service of Suit Clause to comply with all requirements necessary to give such Court jurisdiction.
>
> In respect of claims brought against the Insured and indemnified under this policy, as more fully described herein, the choice of applicable law is New York and the choice of jurisdiction is as per the Service of Suit Clause.

*Id.*, Part I, Choice of Law of Law and Jurisdiction, p. 5.

56.     The Schedule for the Aspen UK Excess Policy provides a "Service of Suit" clause, which provides that any complaint filed by CSC relating to the Aspen UK Excess Policy should be served upon Aspen UK's counsel at the following address: "Mendes & Mount, LLP, 750 Seventh Avenue, New York, N.Y. 10019-6829, U.S.A." *Id.*, Part I, Service of Suit, pp. 5-6. Additionally, the Aspen UK Excess Policy has a "Service of Suit (U.S.A.)" clause, which provides, in relevant part, as follows:

> It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claim to be due hereunder, the Underwriters hereon at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.

*Id.*, at Part II, supp. cl. Service of Suit Clause (U.S.A.), p. 11.

---

[7] /   Emphasized terms in the Aspen UK Excess Policy are defined therein.

57.     The Aspen UK Excess Policy states that the:

> (Re)insurer(s) have seen documents to support the
> assessment of the risk at the time of underwriting including
> but not limited to the following:
>
> - ACE USA Quotation dated 3rd October 2014
> - Loss Runs
> - CSC Presentations

*Id.*, at Part III, Information, p. 19.

## H.     The Drafting History for the Ace Policy

58.     CSC shopped for and purchased its Technology E&O insurance on an annual basis

with the active advice and assistance of experienced and professional insurance brokers at Aon plc

("Aon").  For the 2014-2015 Technology E&O Program, Aon negotiated with Ace the language

of certain terms, conditions, and provisions in the Ace Policy – to which the Defendant Insurers'

respective Excess Policies follow form – to ensure that CSC would be covered for the types of

damages that result from disputes with customers about its technology services or products.

59.     Aon, on behalf of CSC, negotiated with Ace to revise a standard contractual liability

exclusion in the Ace Technology E&O policy form to include a broad "E&O/Negligence

Exception."  The E&O/Negligence Exception stated, in relevant part, that the exclusion would not

apply to:

> ...that part of a **Claim** factually underlying which is, or
> which factually arises out of, an actual or perceived failure
> to perform **Media Activities** or **Technology Services** with a
> reasonable or professional standard of care or consistent with
> industry standards or practices, without regard to whether
> any such failure is alleged or would itself be legally
> actionable.  Further, this exclusion will not apply to...the
> failure of the **Insured's Technology Products** otherwise
> covered by section 1.b. of the definition of **Wrongful Act**....

Ace Policy, § II.C.

60.     CSC intended the E&O/Negligence Exception to make clear that the Contractual

Liability Exclusion in the Ace Policy would not apply to liabilities resulting from the failure of CSC's Technology Products to perform the function or serve the purposes intended by its customer.  Ace understood CSC's intent and agreed to revise the language of its standard contractual liability exclusion to include the E&O/Negligence Exception.  CSC and Ace agreed to include the E&O/Negligence Exception in the Ace Policy to clearly memorialize their shared intent with respect to the scope and proper application of the Contractual Liability Exclusion.

61.     Aon, on behalf of CSC, also negotiated with Ace to revise the standard return of fees exclusion in the Ace Technology E&O policy form to include the "Measure of Damages Exception," which provides as follows:  "compensatory amounts equivalent to fees which are used as a measure of otherwise covered **Damages** shall not trigger this exclusion." Ace Policy, § II.K.5.

62.     CSC intended the Measure of Damages Exception to ensure coverage for an award of compensatory damages to a customer in an amount equal to and measured by the fees the customer paid to CSC.  Ace understood CSC's intent and agreed to revise the language of its standard contractual liability exclusion to include the Measure of Damages Exception.  CSC and Ace agreed to include the Measure of Damages Exception in the Ace Policy to clearly memorialize their shared intent with respect to the scope and proper application of the Return of Fees Exclusion.

**I.      The Defendant Insurers' Conduct Before And At The Time They Sold The Fifth Layer Excess Policies**

63.     Upon information and belief, the Defendant Insurers marketed and continue to market Technology E&O insurance policies as "offering protection for damages and legal defense expenses associated with financial loss claims from third parties…" and associated with "[f]inancial loss claims from third parties, typically customers, arising from a failure of the insured's product or service to conform to the specifications based on which it was sold."

64.     Upon information and belief, the Defendant Insurers marketed and continue to

21

market their ability to create "custom" or "tailored" Technology E&O insurance policies, manuscripted to fit the specific needs of their insureds.

65.     The Defendant Insurers were or should have been aware of the negotiations between CSC and Ace because the Fifth Layer Excess Policies follow form to the Ace Policy.

66.     The Defendant Insurers reviewed or should have reviewed Ace's quotes and/or binders regarding the Ace Policy, which identified the relevant policy form as: "ACE Legal Approved Computer Sciences Manuscript Policy Form."

67.     The Defendant Insurers knew that by selling the Excess Policies to CSC they were representing that their respective Excess Policies extended coverage to CSC for the same subject matter and risk as the coverage afforded by the Ace Policy to which their Excess Policies followed form.

68.     The Defendant Insurers knew that by selling the Excess Policies to CSC they were bound by the shared intent of CSC and Ace with respect to negotiated or manuscripted language in the Ace Policy to which their Excess Policies followed form.

69.     Upon information and belief, when the Defendant Insurers sold the Fifth Layer Excess Policies to CSC, they (without CSC's knowledge) either ignored and did not rely upon, or never intended to be bound by, CSC's and Ace's shared intent with respect to the E&O/Negligence Exception, despite the fact that their respective Excess Policies followed form to the Ace Policy.

70.     Upon information and belief, when the Defendant Insurers sold the Fifth Layer Excess Policies to CSC, they (without CSC knowledge) likewise either ignored and did not rely upon, or never intended to be bound by, CSC's and Ace's shared intent with respect to the Measure of Damages Exception, despite the fact that their respective Excess Policies followed form to the Ace Policy.

22

**J.    The Kemper Claim**

71.    At all relevant times, Kemper was and is in the property & casualty ("P&C") insurance business.

72.    In or about early 2008, Kemper was using separate information technology ("IT") platforms for each of its business segments.   These IT platforms operated on large mainframe computers and were based primarily on COBOL programing language (an acronym for COmmon Business Oriented Language).   Kemper desired a single, unified IT platform that was more modern and flexible.   Kemper believed that an IT platform based on Java language would satisfy this desire.

73.    In or about mid-2008, Kemper began discussions with CSC regarding CSC's Exceed Suite software product.   Exceed Suite was a COBOL-based software product for P&C insurance carriers.

74.    In early 2009, CSC and Kemper entered into a Master Software License and Service Agreement and a series of work and product orders (collectively the "Exceed Agreement").   Under the Exceed Agreement, CSC agreed to convert Exceed from COBOL to Java via a new product called Exceed J, which CSC would implement for Kemper's uses throughout the United States.

75.    Kemper grew dissatisfied with CSC's efforts to develop Exceed J and, on or about October 19, 2015, made a "Demand for Arbitration" before the American Arbitration Association against CSC (the "Demand for Arbitration") styled *Kemper Corporate Services, Inc. v. Computer Sciences Corporation*, No. 01-15-0005-2283 (the "Action").

76.    Kemper alleged that the "essential and fundamental purpose of the [Exceed Agreement] was to supply Kemper with a suite of software products developed in Java programing language that would serve as the platform for its entire P&C business.... CSC did not make Java

version of [Exceed] available, insofar as the software it supplied that it claimed had been converted from COBOL to Java was a complex, unwieldy hybrid that did not offer any of the advantages of a Java environment. Thus the essential and fundamental purpose of the contract was frustrated, and CSC failed to provide the consideration it promised." Demand for Arbitration, ¶¶ 134-135.

77.    On or about November 18, 2015, Aon, on behalf of CSC, gave notice of the Action to all of the insurance companies in CSC's 2014-2015 Technology E&O program (the "Kemper Claim").

78.    On or about November 19, 2015, Endurance and Aspen UK acknowledged receipt of CSC's notice of the Kemper Claim.

79.    On or about December 9, 2015, Homeland acknowledged receipt of CSC's notice of the Kemper Claim.

80.    Beginning on or about April 13, 2017, CSC and Kemper participated in a ten-day arbitration hearing related to the Action, during which the Arbitrator received testimonial and documentary evidence in support of the parties' claims and defenses.

81.    On or about November 15, 2017, the Arbitrator issued a "Final Award" in the Action. In the Final Award, the Arbitrator held that CSC failed to properly develop a Java version of Exceed for use by Kemper, and did not deliver a usable product in completed form. Final Award, pp. 25-26.

82.    The Arbitrator also determined that because CSC did not properly develop a Java version of Exceed, Kemper was entitled to "compensatory damages" totaling $84,296,581. *Id.* pp. 37, 50. Specifically, the Arbitrator awarded Kemper as direct, compensatory damages, "$58,532,652 of the payments it made to CSC pursuant to the [MSLSA]..." and "[a]dditional direct damages" for certain internal expenses incurred during the project, totaling $25,763,929.

24

*Id.*, at pp. 38-39. The Arbitrator awarded pre-judgment interest at a statutory rate of 9% per annum, accruing as of January 3, 2011, on these compensatory damages. *Id.*, p. 40-41. The Arbitrator also awarded Kemper its attorneys' fees, costs and expenses incurred to prosecute its claim against CSC, totaling $7,176,095.23. *Id.*, p. 41.

83.    On or about October 10, 2017, Kemper filed an action in the United States District Court for the Northern District of Texas (the "Northern District of Texas") to confirm the Final Award. Subsequently, CSC moved to vacate the Final Award.

84.    On or about September 18, 2018, the Northern District of Texas denied CSC's motion to vacate the Final Award and granted Kemper's motion to confirm the Final Award.

85.    On or about September 27, 2018, CSC appealed the Northern District of Texas rulings to the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit").

86.    On or about January 10, 2020, the Fifth Circuit denied CSC's appeal and confirmed the Northern District of Texas's rulings in their entirety.

87.    During the period leading up to the Fifth Circuit's denial of CSC's appeal, CSC's insurers that wrote policies in the tower beneath the Fifth Layer Excess Policies, once CSC satisfied its $20 retention under the 2014-2015 Technology E&O program by paying $20 million in Claims Expenses and Damages (as defined by the Ace Policy) in connection with the Kemper Claim, reimbursed CSC's Claims Expenses and paid down the Amended Final Judgment in Kemper's favor in the following amounts, exhausting their policies:

> (a)    The $10 million limit of liability of the Ace Policy was exhausted by Ace's payment of CSC's Claims Expenses and Damages (as defined by the Ace Policy) in connection with the Kemper Claim, totaling $10 million.

(b) The $15 million limit of liability of the Beazley Excess Policy was exhausted by Beazley's payment of CSC's Claims Expenses and Damages (as defined by the Ace Policy) in connection with the Kemper Claim, totaling $15 million.

(c) The $20 million limit of liability of the AIG Excess Policy was exhausted by AIG's payment of CSC's Claims Expenses and Damages (as defined by the Ace Policy) in connection with the Kemper Claim, totaling $20 million.

(d) The $10 million limit of liability of the QBE Excess Policy was exhausted by QBE's payment of CSC's Claims Expenses and Damages (as defined by the Ace Policy) in connection with the Kemper Claim, totaling $10 million.

(e) The $10 million limit of liability of the Scor Excess Policy was exhausted by Scor's payment of CSC's Claims Expenses and Damages (as defined by the Ace Policy) in connection with the Kemper Claim, totaling $10 million.

(f) The $10 million limit of liability of the Ironshore Excess Policy was exhausted by Ironshore's payment of CSC's Claims Expenses and Damages (as defined by the Ace Policy) in connection with the Kemper Claim, totaling $10 million.

88.     On or about February 21, 2020, CSC paid the balance of the Amended Final Judgment to Kemper, in the amount of $89,372,809.02 inclusive of post-judgment interest at the applicable federal rate. All told, CSC's insurers beneath the Fifth Layer paid, as agreed, their full limits of $75 million to cover, under the terms and conditions of the Ace Policy, CSC's Claims Expenses and Damages (as defined in the Ace Policy) in connection with the Kemper Claim.

## K.     The Kemper Claim is Covered

89.     CSC's liability in the Action resulted from a Wrongful Act as defined by the Ace Policy. This is because the Arbitrator determined that (a) CSC did not develop a completed Java

26

version of its Exceed software, *i.e.*, Exceed J, from an earlier COBOL-language version, and (b) as a result, Exceed J could not be implemented by Kemper to consolidate its IT infrastructure and realize the benefits of a robust, modern Java-based platform. Final Award, p. 26.

90.     As explained above, the Ace policy defines a Wrongful Act as "any error... act, omission, neglect, breach of duty...actually or allegedly committed or attempted by any **Insured** ... in the **Insured's**...rendering or failure to render **Technology Services** to others for a fee, or ... the failure of the **Insured's Technology Products** to perform the function or serve the purpose intended." Ace Policy, § II.QQ.1.a.-b.

91.     The Arbitrator determined that CSC did not properly render the Technology Services under the Exceed Agreement, which resulted in an incomplete version of its Exceed software, a Technology Product, that did not serve the purpose intended by the parties. This falls squarely within the definition of a Wrongful Act under the Ace Policy.

92.     Similarly, and as discussed above, the Ace Policy's definition of Damages encompasses "*all* forms of monetary damages, including actual damages,...compensatory damages,...[and] *any* award of prejudgment or post-judgement interest" (Ace Policy, § II.K, emphasis added) and it defines Claims Expenses to include "prejudgment and post judgment interest awarded in *any* **Claim**." *Id.* at § II.F.1., emphasis added.

93.     The Arbitrator awarded the following categories of relief to Kemper: (a) compensatory, direct damages equivalent to and measured by the amounts paid by Kemper to CSC ($58,532,652); (b) additional direct damages for Kemper's internal salaries, costs and expenses ($25,763,929); (c) pre-judgment interest at the statutory rate of 9% per annum starting January 3,

2011 ($50,227,916);[8](d) post-judgment interest at the applicable federal rate ($3,429,713.27);[9] and

(e). Kemper's attorneys' fees, costs and expenses in prosecuting the Action ($7,176,095.23). *See*

Final Award, pp. 38-41, 50.

94.     All of relief awarded by the Arbitrator clearly falls within the definitions of

Damages and/or Claims Expenses in the Ace Policy.

**L.     The Defendant Insurers' Wrongful Denial of Coverage for the Kemper Claim**

95.     On or about November 3, 2017, the Defendant Insurers sent CSC a coverage

position letter written by their counsel.  By this letter, the Defendant Insurers reserved their rights

to limit or deny coverage for the Kemper Claim based on certain exclusions in the Ace Policy,

including the Contractual Liability Exclusion and the Return of Fees Exclusion.

96.     On or about November 15, 2017, CSC sent the Defendant Insurers a responsive

letter written by its counsel.  By this letter, CSC explained that the Defendant Insurers'

interpretation of certain exclusions and application to the Final Award, if correct (which it was

not), would render the 2014-2015 Technology E&O Program worthless.

97.     On or about November 28, 2017, the Defendant Insurers sent CSC a responsive

letter written by their counsel.  By this letter, the Defendant Insurers doubled-down on their

erroneous coverage position and failed to address CSC's concerns regarding their interpretation

and application of certain exclusions, which resulted in illusory coverage under the 2014-2015

Technology E&O Program.

---

[8] /  The accrual of pre-judgment interest was severed on September 19, 2018, when the Northern District of Texas issued its initial Final Judgment.

[9] /  The accrual of post-judgment interest, pursuant to 28 U.S.C. § 11961, began on September 19, 2019 when the Northern District of Texas issued its initial Final Judgment in the Action.  The accrual of post-judgment interest was severed on February 21, 2020 when CSC paid the Amended Final Judgment in full.

98.     On or about December 19, 2017, CSC sent the Defendant Insurers another responsive letter written by its counsel.  By this letter, CSC again explained to the Defendant Insurers that their coverage position was incorrect and improper.  Additionally, by its December 19, 2017 letter, CSC explained that the Ace Policy was manuscripted specifically to cover a claim like the Kemper Claim, and that the Insurers were acting in bad faith by refusing to agree to cover the Kemper Claim.  CSC noted that the carriers' bad faith was supported by the fact that **all of the lower layer insurers in the 2014-2015 Technology E&O Program, interpreting the same Ace Policy, had committed their limits to CSC** to pay the attorneys' fees, costs, expenses, damages, pre-judgment interest and post-judgment interest awarded to Kemper in the Action.

99.     On or about January 12, 2018, the Defendant Insurers sent CSC a responsive letter written by their counsel.  By this letter, the Defendant Insurers suggested that CSC's concerns surrounding illusory coverage were unfounded because CSC's damages in the Kemper Claim "are simply uninsurable."

100.    On or about March 9, 2018, CSC sent the Defendant Insurers a responsive letter written by its counsel.  By this letter, CSC provided the Defendant Insurers with case law that had squarely rejected the Defendant Insurers' interpretation of the Return of Fees Exclusion as "conceptually flawed" and "without merit."

101.    On April 9, 2018, the Defendant Insurers sent CSC a responsive letter written by their counsel.  By this letter, the Defendant Insurers did not distinguish the case law cited in CSC's prior letter.

102.    On or about December 11, 2018, CSC sent the Defendant Insurers a letter written by its counsel, detailing an opportunity to settle the Action for any amount less than what Kemper was entitled to under the Final Award.  CSC asked that the Insurer inform it whether they "would

29

commit their collective $25 million limits toward a settlement offer[.]"

103.    On or about December 14, 2018, the Defendant Insurers sent CSC a responsive letter written by its counsel making clear that the Defendant Insurers unequivocally "denied coverage" for the Kemper Claim and refused to contribute their collective $25 million limits toward a settlement with Kemper for less than the amount of the Final Award.

104.    On or about July 25, 2019, CSC and the Defendant Insurers mediated their dispute in New York, satisfying the mediation requirement of the ADR provision.

105.    All of the insurers in the layers beneath the Fifth Layer have paid the limits of their policies to CSC for Claims Expenses and Damages, allowing CSC to pay the Amended Final Judgment amount to Kemper.  These were not *ex gratia* payments.  These insurers paid for these Claims Expenses and Damages because they were covered under the Ace Policy and, by extension, their respective follow form excess policies.

<u>COUNT I</u>

**(Breach of Contract Against All Defendants)**

106.    CSC incorporates by reference the allegations contained within paragraphs 1 through 106 of the Complaint as if fully set forth herein.

107.    The Fifth Layer Excess Policies are contracts between each carrier and CSC.  The Fifth Layer Excess Policies follow form to the Ace Policy.  The Kemper Claim triggered the Technology and Internet Errors and Omissions Liability insuring agreement in the Ace Policy.

108.    CSC has complied with all terms, provisions and conditions in the Ace Policy and the Fifth Layer Excess Policies.

109.    The unequivocal terms of the Ace Policy's Technology and Internet Errors and Omissions Liability insuring agreement obligate the Defendant Insurers to pay all attorneys' fees,

30

costs, expenses, damages, pre-judgment interest and post-judgment interest resulting from the Kemper Claim.

110.    The Defendant Insurers have breached the Ace Policy and, thereby, the Fifth Layer Excess Policies, by declining to pay for all attorneys' fees, costs, expenses, damages, pre-judgment interest and post-judgment interest resulting from the Kemper Claim.  They have caused CSC damages in the form of the $25 million payment it was forced to make to Kemper to satisfy the Amended Final Judgment, as well as unreimbursed Claims Expenses and consequential damages. CSC is entitled to judgment against the Defendant Insurers for these damages.

## COUNT II

### (Breach of Implied Covenant of Good Faith and Fair Dealing

### Against All Defendants)

111.    CSC incorporates by reference the allegations contained within paragraphs 1 through 111 of the Complaint as if fully set forth herein.

112.    The Fifth Layer Excess Policies are contracts between each carrier and CSC.

113.    The Fifth Layer Excess Policies contain an implied covenant of good faith and fair dealing requiring that the Defendant Insurers act in good faith toward, and deal fairly with, CSC.

114.    The Defendant Insurers have breached this implied covenant of good faith and fair dealing by, among other things, arbitrarily, unreasonably and/or dishonestly interpreting: (a) the Return of Fees Exclusions as applying to the Kemper Claim; (b) the Measure of Damages Exception as not applying to the Kemper Claim; (c) the Contractual Liability Exclusion as applying to the Kemper Claim; and (d) the E&O/Negligence Exception as not applying to the Kemper Claim.  No reasonable insurance company, acting in conformity with insurance industry custom and practice, would interpret the foregoing exclusions or exceptions in the same or similar

31

manner, nor assert that the Kemper Claim is not covered by their respective Fifth Layer Excess Policies.

115.    The Defendant Insurers have breached the implied covenant of good faith and fair dealing by, among other things, arbitrarily, unreasonably and/or dishonestly refusing to cover all pre- and post-judgment interest resulting from the Kemper Claim.  No reasonable insurance company, acting in conformity with insurance industry custom and practice, would interpret the definition of Claims Expenses or Damages in the same or similar manner, nor assert that only part of the pre- and post-judgment interest awarded to Kemper is covered by their respective Fifth Layer Excess Policies.

116.    Under the Homeland Excess Policy, Homeland warranted that it ceded its right to make coverage determinations with respect to any and all Claims under the Homeland Excess Policy to Ace and its representatives.  Homeland has breached the implied covenant of good faith and fair dealing by, among other things, dishonestly refusing to adopt Ace's determination that the Kemper Claim is covered under the Ace Policy.  No reasonable insurance company, acting in conformity with insurance industry custom and practice, would refuse to abide by this warranty.

117.    The Defendant Insurers have breached the implied covenant of good faith and fair dealing by, among other things, arbitrarily, unreasonably and/or dishonestly refusing to offer, commit or pay their collective $25 million limit of liability toward a settlement with Kemper, during the pendency of CSC's appeal, for an amount less than the then-current amount of the Amended Final Judgment. No reasonable insurance company, acting in conformity with insurance industry custom and practice, would have refused to offer, commit or pay their limit toward a settlement with Kemper that would have significantly reduced their insured's exposure.

118.    The conduct of the Defendant Insurers in breaching the implied covenant of good

32

faith and fair dealing was and continues to be dishonest and willful, and in wanton disregard of CSC's rights, far beyond mere negligence.

119.    CSC has sustained damages and will continue to sustain damages as a result of the Defendant Insurers' respective breaches of the Fifth Layer Excess policies and the implied covenant of good faith and fair dealing, including, but not limited to, (a) the attorneys' fees and costs it was forced, and continues to be forced, to incur to prosecute its claim for coverage of the Kemper claim; and (b) the amounts it paid toward satisfaction of the Amended Final Judgment in addition to the $25 million representing the Fifth Layer, because the Defendant Insurers refused to offer, commit, or pay any part of a settlement with Kemper for less than the then-current amount of the Amended Final Judgment.  The genesis of these damages, and the parties' contemplation of their probable result, occurred just before and at the time the Defendant Insurers' sold the Fifth Layer Excess Policies to CSC.

## **PRAYER FOR RELIEF**

WHEREFORE, CSC prays for judgment as follows:

120.    First Cause of Action:

    (a)    Compensatory damages;

    (b)    Consequential damages;

    (c)    Pre-judgment interest in accordance with law;

    (d)    Post-judgment interest in accordance with law;

    (e)    Expenses and costs incurred herein; and

    (f)    Such other and further relief as this Court deems just and proper.

121.    Second Cause of Action:

    (a)    Compensatory damages;

    (b)    Consequential damages;

    (c)    Reasonable attorneys' fees and costs to enforce the Kemper Claim, including, but not limited to, attorneys' fees and costs pursuant to Virginia Code §§ 38.2-209, 38.2-807;

    (d)    Pre-judgment interest in accordance with law;

    (e)    Post-judgment interest in accordance with law;

    (f)    Expenses and costs incurred herein; and

    (g)    Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, CSC demands a trial by jury.

Dated: February 21, 2020 _____

BARNES & THORNBURG LLP

*/s/ Robert J. Boller* _____
Robert J. Boller (NY Bar No. 4440996)
445 Park Avenue, Suite 700
New York, NY 10022
Telephone: 646-764-2020
Facsimile: 646-764-2001
Email: rboller@btlaw.com

David E. Wood (CA Bar No. 121170) (*pro hac vice application pending*)
Joshua B. Rosenberg (CA Bar No. 294484 (*pro hac vice application pending*)
2029 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone: 310-284-3880
Facsimile: 310-284-3894
Email: david.wood@btlaw.com
Email: jrosenberg@btlaw.com

*Attorneys for Computer Sciences Corporation*